# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |
|---|---|
| ) | |
| IN RE: REALPAGE, INC., RENTAL ) | **Case No. 3:23-md-3071** |
| SOFTWARE ANTITRUST LITIGATION ) | **MDL No. 3071** |
| (NO. II) ) | |
| ) | **JURY DEMAND** |
| ) | |
| ) | **Judge Waverly D. Crenshaw, Jr.** |
| ) | |
| ) | **This Document Relates to:** |
| ) | **ALL CASES** |
| ) | |

## MDL PLAINTIFFS' RESPONSE TO STATEMENT OF INTEREST FILED BY FOUR ATTORNEYS GENERAL

On October 1, 2025, Plaintiffs filed a Motion for Preliminary Approval (Dkt. 1246), seeking preliminary approval of class action settlements with various Defendants. Four Attorneys General from the District of Columbia ("D.C."), Kentucky, Maryland, and New Jersey (collectively "the AGs") have submitted a Statement of Interest concerning Plaintiffs' Motion (Dkt. 1281), the full version of which was filed under seal (Dkt. 1280). The AGs request this Court withhold preliminary approval of the proposed settlements with six Defendants whom the AGs sued well after (in some cases several years after) this MDL was formed (the "Overlapping Settling Defendants"). They ask the court to deny or defer preliminary approval, asserting that (in a *parens patriae* capacity) they can veto any settlement and need more information to evaluate the settlements and related Class Action Fairness Act ("CAFA") notices. Plaintiffs respectfully request that the Court reject the AGs' arguments.

As an initial matter, the AGs' requests are premature. The Court should first decide whether to preliminarily approve the settlements and start the notice and objection process for the real parties in interest in this litigation—the AGs' own constituents—the renters.

Perhaps more importantly, the AGs have not articulated Article III standing in their *parens patriae* role to object to the adequacy of the settlements. The interests the AGs seek to protect here are not sovereign or even quasi-sovereign in nature. Instead, the admitted interest is in rent damages for (and incurred by) their residents.[1] Accordingly, under the circumstances presented here, the States and the District are only nominal parties and lack standing to deny or delay this Court's consideration of preliminary approval. *See Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019) ("[t]o assert *parens patriae* the State must articulate an interest apart from the interests of particular private parties . . . the State must be more than a nominal party.") (cleaned up).[2] On this basis alone, the Court should deny the AGs' request to derail preliminary approval.

Finally, contrary to the AGs' assertions, there is sufficient information for the AGs to evaluate the fairness of the monetary and non-monetary settlement terms (including injunctive relief and cooperation terms) as to the Overlapping Settling Defendants. As to their concerns about the CAFA notices, any alleged deficiency can be addressed in short order and without the drastic relief of denying or delaying preliminary approval. As noted in their brief, the Overlapping Settling Defendants both (a) deny that the CAFA notices are deficient, and (b) point out that they have

---

[1] *See* AGs' Statement of Interest, Dkt. 1281 at 6, n.3. All "Dkt. __" references are to *In re: RealPage, Inc., Rental Software Antitrust Litigation (No. II)*, No. 3:23-md-03071 (M.D. Tenn.) unless otherwise stated.

[2] *See also* August 29, 2025 Order, *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-02724 slip op., (E.D. Pa.), Dkt. 3600, (finding that the states lacked Article III standing to intervene and object on behalf of consumers in their respective states) (attached as **Attachment A** hereto). The Court in the *Generic Pharms.* case considered the States' objections in the form of *amicus curia*. *Id*. at 3. Incidentally, even after treating the States' stated concerns as an *amicus* brief, the district court ultimately granted final approval. *See In re: Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 2777570 (E.D. Pa. Sept. 26, 2025).

provided tenant information to the AGs that would allow each State to identify the number of its residents impacted by the settlements and the duration of such impact.[3]

## BACKGROUND

Beginning in October 2022, various private plaintiffs filed lawsuits against RealPage, Inc. ("RealPage") and other companies that owned or managed multifamily housing properties.[4] In April 2023, the Judicial Panel on Multidistrict Litigation ("JPML") created this multidistrict litigation ("MDL") and transferred all existing private cases to this Court.[5] Plaintiffs filed an initial consolidated complaint in June 2023 (Dkt. 291), an amended consolidated complaint in July 2023 (Dkt. 314), and the operative second amended consolidated complaint in September 2023 (Dkt. 530) – all of which sought certification of a nationwide class of renters. Among other Defendants, Plaintiffs named Avenue5 Residential LLC ("Avenue5"), Bell Partners, Inc. ("Bell"), BH Management Services, LLC ("BH"), Bozzuto Management Company, First Communities Management, Inc. ("FCM"), and Greystar Management Services, LLC ("Greystar").

The AGs assert that their States are far ahead of the MDL action with respect to the six Overlapping Settling Defendants, but the timeline shows otherwise. On November 1, 2023, about a year after the first class action complaints were filed, the D.C. AG filed a complaint in D.C.

---

[3] *See* Overlapping Settling Defendants' Response to AGs' Statement of Interest, Dkt. 1291 at 29. *See also Chapman*, 940 F.3d at 306 (CAFA itself does not create a right of action for the AGs, but instead requires defendants in a class action settlement to notify the AGs of the terms of the proposed settlements).

[4] *See, e.g.*, Complaint, *Bason, et al. v. RealPage, et al.*, No. 3:22-cv-01611, Dkt. 1 (S.D. Cal. filed Oct. 19, 2022); Complaint, *Morgan, et al. v. The Irvine Company, et al.*, No. 8:22-cv-02136, Dkt. 1 (C.D. Cal. filed Nov. 23, 2022); Complaint, *Weaver v. RealPage, Inc., et al.*, 1:22-cv-03224, Dkt. 1 (D. Colo. filed Dec. 14, 2022).

[5] The JPML also transferred subsequently filed private cases to this Court. (*See, e.g.*, Dkt. 4 (12 cases transferred); Dkt. 7 (one case transferred), Dkt. 407 (one case transferred), Dkt. 457 (one case transferred), Dkt. 540 (one case transferred), Dkt. 879 (three cases transferred); Dkt. 996 (one case transferred)). All but four of these cases had been filed by November 1, 2023—the date that the D.C. AG filed its initial complaint.

Superior Court, naming (*inter alia*) Avenue5, Bell, Bozzuto, and Greystar, on substantially the same grounds that MDL Plaintiffs had alleged. The other three objecting State AGs did not file until 2025: on January 15, 2025, the Maryland AG filed a lawsuit that named Bozzuto and Greystar (among other overlapping Defendants); on April 23, 2025, the New Jersey AG filed a lawsuit in the District of New Jersey, naming (in relevant part) Bozzuto and Greystar; and on July 2, 2025, the Kentucky AG filed a lawsuit in the Eastern District of Kentucky, naming (in relevant part) BH, FCM, and Greystar (the "AG Actions"). These 2025 actions asserted substantially the same allegations against the overlapping Defendants that MDL Plaintiffs had alleged years earlier. None of the AGs sued BH or FCM until July 2025 (when they were named in the Kentucky AG action). The individual State *parens patriae* actions are not comparable to the nationwide MDL action and are not "ahead" in any material way.

First, the MDL is a nationwide action. Accordingly, information was needed from across the country—as well as from over 50 separate entities and RealPage. This required MDL Plaintiffs to conduct a tremendous amount of discovery—more, not less, than the AG Actions. Defendants in the MDL produced over 24 terabytes of structured data to the MDL Plaintiffs. Defendants also re-produced (as part of some of the earliest production waves in the MDL) their governmental productions, which included productions that they had made to the Department of Justice ("DOJ"), and later to the D.C. AG, and (in some cases) to other jurisdictions as well.[6] Plaintiffs also served extensive written discovery that resulted in national productions far exceeding what each Defendant had produced to the D.C. AG. Overlapping Settling Defendants produced additional

---

[6] Plaintiffs reviewed the exhibits attached to the AGs' Statement. All of those documents have already been produced in the MDL (sometimes multiple times) and, in some instances, MDL Plaintiffs received longer email threads than what the D.C. AG attached. This dispels the assertion that the exhibits attached to the Statement give the AGs superior knowledge.

documents and engaged in lengthy negotiations prior to any settlement reached with 26 Defendants—nearly half of the originally named Defendants.[7] To date, the D.C. AG has settled with just one defendant named in that action. The other three State actions are just getting off the ground.

The monetary amount of the settlements subject to Plaintiffs' Motion for Preliminary Approval total $141,800,000. In their recent action against Greystar, the DOJ and the nine states filing with the DOJ primarily sought injunctive relief. The DOJ case settled with Greystar for the exact same injunctive relief that the MDL Plaintiffs obtained. In addition, the MDL Plaintiffs obtained a $50 million recovery for renters. By contrast, the State of Nevada recently settled with RealPage—the main Defendant in the case—for $500,000.00 and a consent decree. Similarly, North Carolina and Colorado collectively settled their civil antitrust enforcement claims with the sizeable Cortland Management, LLC for injunctive relief and civil penalties of $200,000.[8] As to the one settlement the D.C. AG obtained for $1 million, the settlement agreement itself does not require the District to distribute the funds to resident renters.[9] Thus, in parallel State actions, the remedies that AGs have sought (or are seeking) vary. This is not a criticism of their actions. Rather, it highlights the importance of the MDL action for renters across the nation.

Also, each Overlapping Settling Defendant has not only agreed to cease providing nonpublic data to RealPage for use in competitor pricing recommendations made through RealPage's RMS, but also to refrain from using RealPage's revenue management solutions

---

[7]  Depositions followed behind the significant document productions. The MDL Plaintiffs have taken over 50 substantive depositions that have only served to confirm their view of the evidence.

[8]  *See U.S. v. RealPage, Inc., et al.*, No. 24-cv-00710 (M.D.N.C.), slip op. at 6, Dkt. 126.

[9]  The settlement agreement with William C. Smith and Company specifically allows the District to use the payment for any lawful purpose. *See* Consent Judgment and Order, *District of Columbia v. RealPage, Inc., et al.*, Case No. 2023-CAB-006762 (D.C. Sup. Ct. June 22, 2025). *See also* Overlapping Settling Defendants' Response to AGs' Statement of Int., Dkt. 1291 at 20.

("RMS") that rely on non-public competitor data to make pricing recommendations. Indeed, these settlements almost certainly led to RealPage's removal of non-public data from its RMS offerings. Additionally, the Overlapping Settling Defendants have agreed to waive any right to enforce arbitration clauses, class action waivers, and jury trial waivers as to the claims at issue.

In addition, the settlements contain significant litigation assistance. These include: (1) document and data production (including in commitments for informal conferences on data issues); (2) numerous Rule 30(b)(1) and 30(b)(6) depositions, which will assist in continuing to develop evidence of a conspiracy as to the remaining defendants; (3) attorney proffers, which will, among other things, help prepare for those depositions; (4) assistance in authenticating documents for trial; (5) in-person trial witnesses; and (6) agreements to respond to limited interrogatories. These cooperation terms are valuable for the Settlement Class and will (among other things) facilitate Plaintiffs in pursuing their class claims against RealPage and the other remaining Defendants (which include some of the largest Defendants in the MDL).

Plaintiffs and Interim Co-Lead Counsel believe these settlements to be in the best interests of the Settlement Class. They secure a large amount of money relative to the Overlapping Settling Defendants' market position, *i.e.*, mainly that of managers not owners. In addition, the overlapping settlements provide significant injunctive relief and valuable cooperation, including live trial witnesses for any ultimate trial. Most importantly—and contrary to the AG's claims—the Overlapping Settling Defendants will cease their allegedly anticompetitive conduct, which secures future benefits for the Settlement Class and other renters nationwide.

## ARGUMENT

## I. The State AGs' Purported Objection Is Premature.

As a threshold matter, the State AGs' Statement of Interest seeks extraordinary relief: veto power over any class settlement at the preliminary approval stage where an AG files a subsequent

action in a *parens patriae* capacity. The AGs cite no authority for this sweeping proposition. The relief they seek would prevent Plaintiffs from even providing notice to the AGs' own constituents of the MDL settlement agreements—notice that, would allow those constituents to make their own informed decisions under Rule 23's procedural safeguards. To the extent the Court is inclined to consider arguments from the State AGs (who, as noted below, fail to articulate standing to make such an objection), those arguments should be reserved for after preliminary approval and considered in conjunction with the views of actual class members.[10]

## II. The State AGs Have Articulated No Cognizable Basis For Standing To Object To MDL Settlements.

Even if construed as a substantive objection to the settlements, the State AGs fail to articulate a cognizable basis for standing. The State AGs do not directly address (or mention) standing at all in their brief. Instead, they argue that they are charged with "protecting the public interest" (AGs' Statement of Interest Dkt. 1281 at 3). While there are certainly cognizable bases for standing, this is not one of them. In fact, this issue was squarely addressed just months ago in another antitrust MDL, *In re Generic Pharmaceuticals Pricing Antitrust Litig.*[11] There, after private plaintiffs reached proposed national class action settlements with certain defendants, 42 states and territories (including the District of Columbia, Maryland, and New Jersey) sought to intervene to object to (and defeat) the proposed settlements after preliminary approval, but prior

---

[10] For this reason, courts typically wait until the final approval stage to address whether a proposed class settlement being objected to by governmental entities on behalf of their residents is fair, reasonable, and adequate. *See Elliott v. LVNV Funding, LLC*, 2019 WL 4007219, at *10 (W.D. Ky. Aug. 23, 2019); *see also In re Am. Investors Life Ins. Co. Annuity Mktg & Sales Prac. Litigation*, 263 F.R.D. 226 (E.D. Pa. 2009) (addressing *amicus* briefs from governmental entities in opposition to nationwide class settlement after preliminary approval and in connection with final approval).

[11] August 19, 2025 Order, *Generics*, No. 16-md-02724 (E.D. Pa.), slip op., Dkt. 3600. **Attachment A** hereto ("*Generics* 8/19/25 Order").

to final approval, arguing that the settlements implicated their interests in obtaining a fair recovery for consumers. There, the district court held that the states lacked Article III standing to intervene because the real parties in interest were their citizens and the AGs' interests were not sovereign in nature.

The court in *Generics* cited to the leading Supreme Court case discussing the nature of states' *parens patriae* claims, *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, which examined the difference between a nominal interest and a quasi-sovereign or sovereign interest.[12] The *Generics* court summarized:

> A quasi-sovereign interest "consist[s] of a set of interests that the State has in the well-being of its populace." [*Snapp*, 458 U.S.] at 602. A sovereign interest concerns "the exercise of sovereign power over individuals and entities within the relevant jurisdiction," which "involves the power to create and enforce a legal code, both civil and criminal." *Id.* at 601. "[I]f a state can demonstrate that, in bringing an action, it seeks only to protect the well-being of its residents in general, it has expressed a quasi-sovereign interest in the entire action. If it has expressed such a comprehensive quasi-sovereign interest, it has authority under the common law *parens patriae* doctrine to pursue the relief it seeks, and therefore is the sole real party in interest in the suit." *W. Virginia ex rel. McGraw v. Comcast Corp.*, 705 F. Supp. 2d 441, 446 (E.D. Pa. 2010). In contrast, the "[i]nterests of private parties are obviously not themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement. In such situations, the State is no more than a nominal party." *Snapp*, 458 U.S. 592 at 602.[13]

Here, as in *Generics*, the State AGs' stated interest is to aid in the achievement of damages for their constituents, making them a nominal party without standing to object.

The Sixth Circuit has adopted a similar analysis applicable to the circumstances of this case. In *Chapman v. Tristar Prods., Inc.*, the Arizona AG tried to appeal a class settlement, based on its claimed *parens patriae* standing. The Sixth Circuit found that "the only objections that Arizona can make are indistinguishable from the objections which individual Arizonans might

---

[12] *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982).
[13] *Generics* 8/19/25 Order at 4-5.

raise." *Chapman*, 940 F.3d at 306. The Sixth Circuit concluded that "such claims would make Arizona 'merely a nominal party' and would not give rise to any quasi-sovereign interests." *Id.* For these reasons, the Sixth Circuit affirmed a district court order holding that the Arizona AG did not have standing to intervene or to object to a nationwide class action settlement—and affirmed the district court's order finally approving that settlement.

To be clear, Plaintiffs are not saying that state AGs *never* have standing to object to class settlements, nor would that be consistent with *Snapp*. But the interests expressly articulated by the State AGs here do not meet the standard espoused in *Snapp* and adopted by the Sixth Circuit and the *Generics* court. On that basis, the State AGs have failed to make the requisite showing here. [14]

### III. *Parens Patriae* Actions *Are Not* Superior To Class Actions Under Rule 23 Of The Federal Rules Of Civil Procedure.

In addition, the AGs argue their *parens patriae* claims are superior to the Rule 23 MDL class claims. This is simply not so.[15] Private class actions are subjected to extensive procedural safeguards to ensure that the interests of class members are protected and that members are adequately represented. This is a feature, not a bug. When courts aggregate claims, it can pose a threat to traditional notions of affirmative client consent—consent to be represented by a particular

---

[14] In addition, the MDL settlements specifically carve out the AGs' enforcement claims, including sovereign and quasi-sovereign claims. *See* Proposed Order (Dkt. 1246-1) (excluding from the Settlement Class definition "any federal, state or local governmental entities; instrumentalities of the federal government; states and their subdivision agencies, and instrumentalities" among others). The AGs accordingly could continue to enforce any public rights they have. But it is otherwise appropriate for the releases to include provisions that would preclude the AGs from double-recovering for their residents in a *parens patriae* capacity. *See, e.g., California v. IntelliGender, LLC*, 771 F.3d 1169, 1179 (9th Cir. 2014); *Esslinger v. HSBC Bank Nevada, N.A.*, 2012 WL 5866074, at *7 n.2 (E.D. Pa. Nov. 20, 2012); *New Mexico ex rel. King v. Cap. One Bank (USA) N.A.*, 980 F. Supp. 2d 1346, 1351 (D.N.M. 2013).

[15] *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 13152270 at *9 (N.D. Cal. Aug. 24, 2011) (class actions superior procedurally to *parens patriae* for handling multi-plaintiff claims arising out of a common core of operative facts seeking injunctive relief and damages for a nationwide class subject to common proof).

attorney, and consent to any settlement that the attorney negotiates. To mitigate that threat, class actions are subject to stringent procedural requirements under Rule 23. Rule 23(a) of the Federal Rules of Civil Procedure allows class certification only if four requirements are met: numerosity, commonality, typicality, and adequacy of representation.[16] The first requirement, numerosity, ensures that there is a sufficiently large number of related claims and plaintiffs to warrant the aggregation of such claims. The remaining three requirements are designed to guarantee that those interests will be vigorously represented. For damages actions like this one, Rule 23(b)(3) also requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[17] In any event, the procedural safeguards provided by Rule 23 (*e.g.*, predominance, typicality, commonality) are not present in *any* of the AG actions.[18] At this stage, the Court is tasked with conducting an initial assessment of proposed class settlements to determine whether final approval is likely, and whether the proposed settlements warrant the time and expense associated with issuing notice to the class and soliciting reactions from the class.[19] This is the procedure the AGs seek to derail here. *See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 337 (2d Cir. 1985), ("[t]he existence of multiple and harassing actions by the states could only serve to frustrate the

---

[16] *See* Fed. R. Civ. P. 23(a).

[17] Fed. R. Civ. P. 23(b)(3).

[18] Maryland references a statute, Md. Code, Com. Law § 11-209(c), which provides that "[a]n action brought by the Attorney General as *parens patriae* . . . is presumed superior to any class action brought on behalf of the same person." However, as the Settling Defendants correctly point out, this only a presumption – and the legislative history makes clear that it is rebuttable and can be overcome where consumers are (as here) better served through a class action. (Overlapping Settling Defendants' Response to AGs' Statement of Interest, Dkt. 1291 at 16-19).

[19] *See generally Shane Grp., Inc. v. Blue Cross Blue Shield*, 825 F.3d 299, 3-9 (6th Cir. 2016); *Romstadt v. Apple Computer, Inc.*, 948 F. Supp. 701, 705 (N.D. Ohio 1996).

district [c]ourt's efforts to craft a settlement in the multidistrict litigation before it. . . . and destroy the utility of the multidistrict forum") (cleaned up).

As it relates to settlements, Rule 23 also requires that a federal district court approve any proposed class action settlement before it can be effective. (*See* Fed. R. Civ. P. 23(e).) The court must conduct a hearing and may only approve the settlement if, in the court's determination, the settlement is fair, reasonable, and adequate—taking into account various factors including (among others) adequacy of representation, the presence of arm's length negotiations, and adequate relief. (*See* Fed. R. Civ. P. 23(e)(2).) These procedures protect the rights of individual settlement class members and ensure that any class settlement is thoroughly and appropriately vetted by the Court before going into effect and, in particular, binding class members and (as here) releasing their individual claims.

In contrast, the AGs are not bound by Rule 23(e). Accordingly, as their brief intimates, in a *parens patriae* capacity they could seek to (and purport to) unilaterally resolve the claims of individual consumers without many of the constraints that Rule 23(e) imposes. For these reasons, private settlements subject to Rule 23(e) (rather than *parens patriae* settlements) provide a superior mechanism for resolving the claims of individual consumers and protecting their rights.[20]

---

[20] In the D.C. AG action and the Maryland action, the Complaints do not mention seeking restitution as a remedy. Instead, their complaints purport to seek to "recover treble the *damages* that Defendants have forced [D.C./Maryland] renters to incur, civil penalties, and other relief identified below." *See* Complaint, *Maryland v. RealPage, Inc., et al.*, No. C-24-CV-25-003948 (Cir. Ct. for Balt. City), ¶ 11, https://oag.maryland.gov/News/Documents/pdfs/011525_Complaint.pdf (Jan. 15, 2025) (emphasis added); Complaint, *District of Columbia v. RealPage, Inc., et al.*, Civil Action No. 2023-CAB-006762 (D.C. Sup. Ct.), ¶ 11, https://oag.dc.gov/sites/default/files/2023-11/DC%20OAG%20RealPage%20Complaint%20-%20Filed.pdf (Nov. 1, 2023) (emphasis added). Their respective prayers for relief also ask that any judgment include an "Award *to Plaintiff* [*i.e.*, the government] . . . damages as *parens patriae* . . . ." (Complaint, *Maryland v. RealPage, Inc., et al.*, No. C-24-CV-25-003948 (Cir. Ct. for Balt. City), ¶ 11, https://oag.maryland.gov/News/Documents/pdfs/011525_Complaint.pdf (Jan. 15, 2025)

## IV.    The Settlements Are Fair, Reasonable, And Adequate

The AGs also question whether the settlements are fair, reasonable, and adequate within the meaning of Rule 23(e). Their stated concerns are without merit.

The settlement agreements between Plaintiffs and Overlapping Settling Defendants are the product of hard-fought, arm's length negotiations by counsel highly experienced in complex antitrust class actions. At all times, both sides vigorously negotiated their respective positions. The negotiations were conducted in good faith, resulting in fair, reasonable, and adequate settlements.

Contrary to the AGs' contention, MDL Plaintiffs had more than sufficient evidence to enter into the settlements. When the litigation began, Plaintiffs secured volumes of commerce information, including average rents, number of units for each Defendant and whether the Defendant was a manager, owner or manager/owner, well ahead of any settlement discussion. From there, the MDL Plaintiffs had the benefit of all the documents turned over to the DOJ and several states involved in that action. This was in addition to documents produced by each Overlapping Settling Defendant before any settlement was entered into. Finally, each settlement was the result of a lengthy settlement process overseen by a court-appointed mediator.

For example, the largest Defendant that MDL Plaintiffs have settled with is Greystar. That settlement—and the extensive injunctive relief obtained—was done in conjunction with Greystar's negotiations and settlement with the DOJ. In addition to obtaining the same injunctive relief by the DOJ, the MDL Plaintiffs also obtained a $50 million recovery for the benefit of affected consumers. Although Greystar is often cited as one of the largest property managers in the country,

---

(emphasis added)). And the equitable relief section expressly asks for "disgorgement" rather than restitution. Regardless, any state AG enforcement action could be dismissed tomorrow if political winds change, or if (for example) Congress decides to remove D.C.'s attorney general and replace it with one appointed by the President, as a current bill seeks to do. *H.R.5179 - District of Columbia Attorney General Appointment Reform Act of 2025*, CONGRESS.GOV, https://www.congress.gov/bill/119th-congress/house-bill/5179 (last accessed Nov. 4, 2025).

which is true—Greystar is mainly just that—a property manager. Further, despite public reporting to the contrary, ownership in the buildings that it manages largely rests with others. In addition, on average, Greystar only uses RealPage RMS—the RMS system at the heart of this case—at less than 50% of the buildings it manages. As a manager, Greystar receives only a fraction of the rents being challenged in this case as inflated due to its use of RealPage RMS.[21]

Finally, the negotiations and settlements were overseen by a Court-appointed mediator, the Honorable Layn Phillips, assisted by Clay Cogman (Dkts. 434 and 475). The negotiations with Greystar alone spanned over a year and many months.

### A. Class Counsel Had Significant Evidence And Data From Which To Negotiate Fair And Reasonable Settlements With The Mediators' Assistance.

The AGs point to *In re CorrectCare Data Breach Litig.*, No. 22-cv-00319, 2024 WL 1403075, at *7 (E.D. Ky. Apr. 1, 2024) for the proposition that the purpose of preliminary approval is to ensure that a settlement is "fair enough" to begin the notice process. There, the court found that, "[a]lthough the parties did not engage in formal discovery, CorrectCare informally provided the plaintiffs with information concerning the size and scope of the class, as well as the private information that was allegedly comprised. This gave the parties sufficient information to engage in settlement negotiations and to reach an agreement that is ostensibly reasonable." *Id.*

Here, Plaintiffs' preliminary approval papers more than meet that standard. The AGs assert that the "MDL plaintiffs negotiated the instant settlements without the benefit of significant discovery" (AGs' Statement of Interest Dkt. 1281 at 9). That is not accurate. As detailed in the attorneys' declaration filed in support of Plaintiffs' preliminary approval motion (Dkt. 1250),

---

[21] The other Overlapping Settling Defendants are mainly managers. As with Greystar, other managers similarly received only a fraction of the rents being challenged as overcharged due to the alleged price-fixing conspiracy.

Plaintiffs have received rolling productions of documents since April 2024. These included hundreds of thousands of documents from the Overlapping Settling Defendants before the end of 2024—and over 1.5 million documents from them before settlement was reached with any of the Overlapping Settling Defendants. Each of the Overlapping Settling Defendants' settlement agreements became final months after the period to complete all document productions had expired in this case (March 2025), with most months after that deadline. Plaintiffs have also had access to RealPage's RMS data since early 2025—before reaching a final settlement agreement with any of the Overlapping Settling Defendants. The data further enabled discovery into RMS usage and coverage—and provided a cross-check of Plaintiffs' early evidence concerning the same.

Also, even before discovery opened in the MDL, Plaintiffs purchased a license to CoStar data, which holds itself out as the "most comprehensive platform for commercial real estate, information, analytics, and news" led by the "largest research term in commercial real estate."[22] CoStar's touted "comprehensive, accurate data" allowed Plaintiffs to investigate and understand the total volume of commerce in controversy early on. This informed many settlement negotiations from the outset. Plaintiffs also received proffers of financial information from each Overlapping Settling Defendant to assist in calibrating reasonable settlement amounts. This exchange of data was done with the assistance of the mediators, who oversaw and facilitated the provision of detailed financial data for each of the six overlapping Defendants. Combined with the voluminous discovery that Plaintiffs obtained through the MDL litigation itself, Plaintiffs had more than sufficient information to negotiate fair and reasonable settlement amounts under the AGs' own cited case law.

---

[22] Products & Solutions, CoStar, https://www.costar.com/products (last accessed November 4, 2025).

Nor did the AGs have access to "unique" evidence that was out of Plaintiffs' reach. Indeed, Plaintiffs' document requests sought all productions that were made to government entities, including those made to the D.C. AG and other AGs. Plaintiffs understand that, for each of the Overlapping Settling Defendants, Plaintiffs actually have *more*, not fewer, produced documents from which to evaluate settlement positions.[23]

> **B. The Settlements' Broad Injunctive Relief Is Reasonable And Tailored To The Claims In This Litigation And Does Not Preclude The AGs From Seeking Additional Injunctive Relief.**

Finally, the AGs complain about the injunctive relief provided in the MDL settlements. The injunctive relief that Plaintiffs achieved to date prohibits the very practice being challenged in this litigation—an agreement to share confidential information to fix prices through the exchange of competitively sensitive data via RealPage's RMS. Indeed, MDL Plaintiffs' efforts in investigating, commencing, and litigating this Action resulted in RealPage (a) first allowing RMS customers to choose whether to use non-public information in connection with their use of RMS, and (b) ultimately shutting down the continued use of non-public information altogether. MDL Plaintiffs catalyzed positive changes by RealPage and have also secured (subject to this Court's approval) binding terms to prevent backsliding in the future.[24] Nothing in the MDL settlements prevents the AGs from continuing their cases to trial (to enforce any non-settled claims) or from seeking broader enforcement relief if they are dissatisfied.[25]

---

[23]  As noted above, MDL Plaintiffs already have the documents that the AGs attached as exhibits to their Statement—and (as to some of those exhibits) have email threads that go further.

[24]  These terms are facially more stringent than what the Nevada AG agreed to with RealPage. There, the Settlement permits RealPage to use nonpublic data to train its pricing algorithm under certain conditions. *See RealPage Reaches Revenue Management Software Settlement with Nevada Attorney General*, REALPAGE (Sept. 10, 2025), https://www.realpage.com/news/realpage-reaches-revenue-management-software-settlement-with-nevada-attorney-general/.

[25]  *See California v. IntelliGender, LLC*, 771 F.3d 1169, 1182 (9th Cir. 2014).

## C.    The AGs Complaints About "Meager" Monetary Recovery Are Hypothetical.

Trial almost always offers the possibility of greater recovery than a settlement. But that does not mean settlements lower than the potential recovery at trial are inadequate, because with trial comes delay and risk. The D.C. AG admits that its trial is not set for another 1.5 years, after which (even if the D.C. AG is successful) the appellate process could run for several more years. The Statement of Interest provides no trial dates for the New Jersey, Maryland, and Kentucky actions—all of which were just filed this year (and in Kentucky's case, just four months ago). Nor can any of the AGs confidently predict what they would recover at trial, if they were to prevail. In the face of that speculative relief, the settlements provide fair and meaningful relief to Plaintiffs and the Class. Indeed, when recently faced with the same argument from State AGs in the *Generics* MDL, Judge Rufe rejected speculation that the AGs might someday get more money, finding that the "nature and amount of relief in other lawsuits cannot be determined and may not come to fruition for some time" and granting final approval to the settlements.[26]

## CONCLUSION

For the foregoing reasons, MDL Plaintiffs respectfully request that the Court deny the AGs' requested relief. Otherwise, allowing any AG to veto a nationwide settlement simply because the AG is also asserting *parens patriae* damages claims for a subset of the class would undermine the class settlement process entirely. As the remaining Defendants themselves have told the Court, that uncertainty would make any negotiated class resolution economically irrational.[27] The proposed settlements are fair, reasonable and adequate—and final approval is likely. Class

---

[26] *See In re Generic Pharms. Pricing Litig.*, 2025 WL 2777570, at *5.

[27] Indeed, the remaining Defendants in the MDL joined in the Settling Defendants' response adding that the "AGs' arguments, if adopted, would create uncertainty as to the value of potential releases in the future and thereby reduce Defendants' incentives to settle the claims in this case and frustrate efforts to do so." (Dkt. 1292 at 2.)

Members with a direct interest should be noticed and their views considered in determining whether to approve these settlements. Specifically, the six Overlapping Settling Defendants collectively produced millions of pages of documents, provided monetary relief and significant injunctive relief as well as litigation cooperation. The Preliminary Approval process should not be derailed by the State AGs.

Dated: November 4, 2025

*/s/ Tricia R. Herzfeld*

Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
1920 Adelicia St., Suite 300
Nashville, TN 37212
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
Isabella De Lisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com
idelisi@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192

Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com

Matthew J. Perez
Daniel F. Loud
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Ave., 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
matt.perez@scott-scott.com
dloud@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
J. Austin Hurt
Caitlin E. Keiper
Navy A. Thompson
Julie C. Moroney
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
ahurt@robinskaplan.com
ckeiper@robinskaplan.com
nthompson@robinskaplan.com
jmoroney@robinskaplan.com

Laura Song
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Ste. 2601
New York, NY 10019
Minneapolis, MN 55402
Telephone: (212) 980-7400
lsong@robinskaplan.com

Swathi Bojedla
Mandy Boltax

**HAUSFELD LLP**
1200 17th Street, Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
Joey Bui
Samual Maida
**HAUSFELD LLP**
580 California Street, 12th Floor
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com
jbui@hausfeld.com
smaida@hausfeld.com

Katie R. Beran
Mindee Reuben
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com
mreuben@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
1001 G. Street, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
Jules A. Ross
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com
jross@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Benjamin J. Widlanski
Javier A. Lopez
Robert J. Neary
**KOZYAK TROPIN &
THROCKMORTON LLP**

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Yifan (Kate) Lv
Amelia F. Burroughs
**BURKE LAW**
402 W. Broadway, Suite 1890
San Diego, CA 92101
Telephone: (619) 369-8244
Facsimile (314) 241-3525
cburke@burke.law
klv@burke.law
afb@burke.law

Joseph R. Saveri
Cadio Zirpoli
Kevin E. Rayhill
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
Nyran Rose Rasche
Kaitlin Naughton
Christopher P. Dolotosky
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
135 S. LaSalle, Suite 3210

2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com
rn@kttlaw.com

Chicago, IL 60603
Telephone:  312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com
nrasch@caffertyclobes.com
knaughton@caffertyclobes.com
cdolotosky@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld